FILED

2015 JUN 17 PM 2: 43

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2014 Grand Jury

CR 15 00334

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 15- |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. § 1959: Violent Crime in Aid of Racketeering; 21 U.S.C. § 846: Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances; 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C): Possession with Intent to Distribute and Distribution of Controlled Substances; 21 U.S.C. § 860: Distribution of Controlled Substances Near a School; 18 U.S.C. § 924(c)(1)(A): Brandishing, Discharging, Carrying, and Using a Firearm During and in Relation to, and Possessing in Furtherance of, a Crime of Violence and a Drug Trafficking Crime; 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and Ammunition; 18 U.S.C. § 922(g)(9): Domestic Violence Misdemeanant in Possession of a Firearm and Ammunition; 18 U.S.C. § 5861(d): Possession of Unregistered Firearm; 18 U.S.C. § 1963: Criminal Forfeiture; 21 U.S.C. |
| JORGE GREY <br> aka "Bouncer," <br> SANTOS ZEPEDA, <br> aka "Slim," <br> JONATHAN ZEPEDA, <br> aka "Japs," <br> aka "Chino," <br> MANUEL VALLEJO, <br> aka "Boxer," <br> GIOVANNI OLVERA, <br> aka "Jiovanni Olvera," <br> aka "Suspect," <br> JULIO BOSQUE, <br> aka "Big Cuba," <br> aka "Cuba," <br> JAVIER BOSQUE, <br> aka "Lil' Cuba," <br> YADIRA VALENCIA, <br> aka "Yadi," <br> FREDERICK HAM, <br> aka "Sinner," <br> FRUTOSO MENDOZA, <br> aka "Toti," <br> aka "Drowsy," | |

RYAN LAUBE,
  aka "Psycho,"
KELLY LEYDEL,
  aka "Giant,"
GERARDO ORTIZ,
  aka "Tank,"
ERIC ALDRETTE,
  aka "Bad Boy,"
RONAL GARCIA,
  aka "Grinch,"
THOMAS GONZALES,
  aka "Tommy,"
  aka "Tom,"
GLORIA VALERIO,
GLORIA ORTEGA,
ROBERT AMADO,
  aka "Listo,"
JUAN MURILLO,
  aka "Nacho,"
JOSE BARRETO,
  aka "Joey," and
CHARLES GOTHARD,
  aka "Chuck,"

          Defendants.

§ 853: Criminal Forfeiture; 18
U.S.C. § 924(d) and 28 U.S.C
§ 2461(c): Criminal Forfeiture]

     The Grand Jury charges:

     GENERAL ALLEGATIONS

A.    THE RACKETEERING ENTERPRISE

     1.    At all times relevant to this Indictment, defendants JORGE
GREY, also known as ("aka") "Bouncer" ("GREY"), SANTOS ZEPEDA, aka
"Slim" ("S. ZEPEDA"), JONATHAN ZEPEDA, aka "Japs," aka "Chino" ("J.
ZEPEDA"), MANUEL VALLEJO, aka "Boxer" ("VALLEJO"), GIOVANNI OLVERA,
aka "Jiovanni Olvera," aka "Suspect" ("OLVERA"), JULIO BOSQUE, aka
"Big Cuba," aka "Cuba" ("JULIO BOSQUE"), JAVIER BOSQUE, aka "Lil'
Cuba" ("JAVIER BOSQUE"), YADIRA VALENCIA, aka "Yadi" ("VALENCIA"),
FREDERICK HAM, aka "Sinner" ("HAM"), FRUTOSO MENDOZA, aka "Toti," aka
"Drowsy" ("MENDOZA"), RYAN LAUBE, aka "Psycho" ("LAUBE"), KELLY

1  LEYDEL, aka "Giant" ("LEYDEL"), GERARDO ORTIZ, aka "Tank" ("ORTIZ"),

2  ERIC ALDRETTE, aka "Bad Boy" ("ALDRETTE"), RONAL GARCIA, aka "Grinch"

3  ("GARCIA"), THOMAS GONZALES, aka "Tommy," aka "Tom" ("T. GONZALES"),

4  GLORIA VALERIO ("VALERIO"), GLORIA ORTEGA ("ORTEGA"), ROBERT AMADO,

5  aka "Listo" ("AMADO"), JUAN MURILLO, aka "Nacho," ("MURILLO"), JOSE

6  BARRETO, aka "Joey" ("BARRETO"), CHARLES GOTHARD, aka "Chucky"

7  ("GOTHARD") (collectively, the "defendants"), and others known and

8  unknown to the Grand Jury, were members and associates of a criminal

9  organization engaged in, amongst other things, conspiracy to traffic

10  in narcotics, narcotics trafficking, extortion, and crimes of

11  violence, including conspiracy to commit murder, murder, attempted

12  murder, and robbery.  At all relevant times, this organization,

13  referred to in this Indictment as "the Arnold Gonzales Organization"

14  or "the enterprise," operated in the Central District of California

15  and elsewhere.  The Arnold Gonzales Organization, including its

16  members, and associates, constitutes an "enterprise," as that term is

17  defined in Title 18, United States Code, Section 1961(4), that is, a

18  group of individuals associated in fact, although not a legal entity,

19  which is engaged in, and the activities of which affect, interstate

20  and foreign commerce.  The enterprise constitutes an ongoing

21  organization whose members function as a continuing unit for a common

22  purpose of achieving the objectives of the enterprise.

23  B.   BACKGROUND OF THE RACKETEERING ENTERPRISE

24       2.   The Northeast region of Los Angeles, California, defined

25  generally as the area marked by the 134 Freeway to the North, San

26  Fernando Road to the South, the 2 Freeway to the East, and the Los

27  Angeles River to the West, traditionally has been racked by pervasive

28  narcotics trafficking, crimes of violence, and violent turf wars

engaged in by the various rival street gangs who claim territory in the area.  These multi-generational, predominantly-Hispanic gangs include, but are not limited to, Frogtown, Toonerville, and the Rascals.  Each of these street gangs traditionally has had its own structure, membership, leadership, and allegiances.  Each also has been associated with "the Mexican Mafia" or "La Eme," a violent prison-based gang.  The Mexican Mafia controls, and provides protection to, the Hispanic inmate population throughout the California penal system, which thereby has allowed it to control Hispanic gangs such as Frogtown, Toonerville, and the Rascals on the streets.  In return for authorizing these gangs to maintain control over their claimed territories and for protecting the gangs' members and associates while incarcerated, the Mexican Mafia requires the gangs to collect and pay "taxes" based on proceeds generated by narcotics trafficking and other illegal activities which take place in their territories.  The collection of such "taxes" from narcotics dealers and others engaging in criminal activities within each gang's territory, including from members and associates of the gangs themselves, is a primary task of the gang's leadership on the streets, as is punishing individuals who fail to pay the requisite "tax."

3.   Frogtown is a multi-generational, predominantly Hispanic gang founded in the early 1950's, which currently is comprised of approximately 90 active members from at least three cliques, the "Park Side Gangsters," the "Church Side Locos," and the "Hill Side Locos."  Frogtown claims the territory between the 110 Freeway on the South, Fletcher Boulevard on the North, the Los Angeles River on the East, and Riverside Drive on the West, to include Elysian Valley.

4

1    Senior members and Original Gangsters ("OGs") of Frogtown include

2    Arnold "Arnie" Gonzales ("EME Gonzales"), a Mexican Mafia member

3    serving a life sentence in Pelican Bay State Prison, and defendant

4    GREY, the "shot caller" who serves as Frogtown's leader on the

5    streets.   Frogtown's primary source of income has been continual

6    narcotics sales, mainly consisting of the trafficking of

7    methamphetamine, through both street sales and "call-out" sales

8    whereby senior members, such as defendants S. ZEPEDA and J. ZEPEDA,

9    drive out to customer locations after receiving narcotics orders via

10   text/telephone communications.   Members of the Frogtown gang further

11   generate revenue through the commission of violent crimes, such as

12   theft, robbery, and extortion (all typically facilitated with

13   firearms amassed by the gang), which also helps to reinforce the

14   gang's feared reputation among local residents and rival gangs.

15   Members of the Frogtown gang often wear "Famous Stars and Straps"

16   apparel, which displays a large, oversized "F" and green-colored

17   clothing, use a hand sign resembling the letter "F" to identify

18   themselves as members of the gang, and write "FTR" and "FT" in

19   graffiti when they "tag" their territory.

20        4.   Toonerville is a multi-generational, predominantly-

21   Hispanic gang founded in the late 1950's, with both of the gang's

22   territories located in Northeast Los Angeles and the City of

23   Glendale, California.   Within the Northeast Los Angeles area,

24   Toonerville claims the territory between the 134 Freeway on the

25   North, Los Feliz on the South, the Los Angeles River on the West, and

26   San Fernando Road on the East.   Toonerville has approximately 450

27   members and consists of several cliques, including "Chevy Chase

28   Locos," "Vagos," "Night Owls," and "Jokers."   Toonerville generates

1   revenue for its members and associates through continual narcotics
2   sales, and is known to protect its territory through the commission
3   of crimes of violence, such as murders and assaults with deadly
4   weapons, to include the ambush killings of police officers.  Members
5   of the Toonerville gang often have tattoos bearing the area codes
6   "818," "323," or "213," the abbreviation, "NE," a picture of a train,
7   "TVR 13," or the letter "T," and also "tag" such numbers, letters, or
8   graphics to mark Toonerville territory.  Members commonly wear
9   apparel associated with the Texas Rangers, the Toronto Blue Jays, the
10   Tampa Bay Devil Rays, and Tennessee Titans.  One of the gang's
11   shotcallers is defendant VALLEJO, who is uniquely situated to act as
12   a liaison between the Toonerville and Frogtown gangs because his
13   father is a Frogtown OG.

14       5.   The Rascals gang is a predominantly-Hispanic, multi-
15   generational gang that was founded in the early 1980's in the Belmont
16   neighborhood of Los Angeles.  The Rascals presently claim the
17   territory between Los Feliz on the North, the 2 Freeway on the South,
18   the Los Angeles River on the West, and San Fernando Road on the East.
19   Members of the Rascals gang typically generate income through vehicle
20   thefts, robberies, and narcotics trafficking.  The Rascals gang has
21   approximately 120 total members, 20-to-30 of whom are presently
22   active of the gang.  Members of the Rascals gang mark their territory
23   by vandalizing local businesses and privately owned residences,
24   including with the tag "TRS 13;" wear sports attire containing the
25   letter "R" and Atlanta Braves attire containing the letter "A"
26   (representing the Atwater Village neighborhood the gang claims as its
27   territory); and bear tattoos reading "TRS" or "ATW."  Defendant ORTIZ
28   is believed to be the Rascal's current shotcaller.

6.   Prior to 2010, each of these gangs considered the others to be rivals and engaged in acts of violence and retaliation against one other in an attempt to protect and/or expand their relative power. During this time, these gangs generally were controlled by Mexican Mafia members Richard "Psycho" Aguirre, Alex "Pee Wee" Aguirre, and Alberto "Boxer" Tolento, with the assistance of EME Gonzales. However, following a series of federal racketeering indictments that led to the incarceration of Richard "Psycho" Aguirre, Alex "Pee Wee" Aguirre, and others, EME Gonzales assumed sole control of the Northeast region of Los Angeles controlled by these gangs in and around September 2010.   EME Gonzalez subsequently implemented a plan to unify the Frogtown, Toonerville, and the Rascals gangs under a "peace treaty" or "truce" maintained under his authority, and EME Gonzalez assigned defendant GREY to serve as the shotcaller of the unified organization emerging from this plan referred to herein as the Arnold Gonzales Organization.

7.   Under the authority provided by EME Gonzalez, defendant GREY brought the Frogtown, Toonerville, and Rascals street gangs together to work in concert to control the narcotics trafficking and other illicit activities committed in their territories.   During this time, defendant GREY has relied upon a select group of individuals within each of these gangs, including defendants S. ZEPEDA and J. ZEPEDA of Frogtown, defendants OLVERA and VALLEJO of Toonerville, and defendant ORTIZ of the Rascals, to disseminate his and EME Gonzalez's orders to rank-and-file members of each gang and to control the Northeast Los Angeles gangs for the benefit and, on behalf, of EME Gonzales.

C.    PURPOSES OF THE ENTERPRISE

8.    The purposes of the Arnold Gonzales Organization include, but are not limited to, the following:

a.    Maintaining control over the Arnold Gonzales Organization territory, including the area of Northeast Los Angeles controlled by the Frogtown, Toonerville, and Rascals gangs for EME Gonzales;

b.    Preserving, protecting, and expanding the power of the Arnold Gonzales Organization, including to areas such as the greater Lancaster, California area, through use of intimidation, violence, threats of violence, assault, and murder.

c.    Enriching EME Gonzales through the remittance of the money generated by "taxing" illicit activities occurring in territories controlled by the enterprise.

d.    Enriching the members and associates of the Arnold Gonzales Organization through, among other things, the control of, and participation in, the trafficking of narcotics in the territory controlled by the enterprise, to include the collection of taxes generated from those trafficking in narcotics in the enterprise's territory.

e.    Promoting and enhancing the Arnold Gonzales Organization and the activities of its members and associates.

D.    THE MEANS AND METHODS OF THE ENTERPRISE

9.    The means and methods by which the defendants and other members and associates of the Arnold Gonzales Organization conduct and participate in the conduct of the affairs of the enterprise include:

1         a.    Members and associates of the Arnold Gonzales

2   Organization commit, attempt to commit, conspire to commit, and/or

3   threaten to commit acts of violence, including assaults, murders,

4   extortion, and acts of intimidation, to promote discipline, fear, and

5   respect, and to protect and expand the enterprise's criminal

6   operation in and beyond its established territory.

7         b.    Members and associates of the Arnold Gonzales

8   Organization engage in narcotics trafficking, extortion, robberies,

9   vehicle theft, and carjackings to generate income for the enterprise.

10        c.    Members and associates of the Arnold Gonzales

11  Organization, operating at the direction of their leaders, "tax"

12  narcotics sales and other profitable illegal activity occurring

13  within the territory controlled by the enterprise to generate income

14  and control the criminal activity undertaken within such territory.

15        d.    Leaders within the Arnold Gonzales Organization

16  control the collection and payment of such taxes to EME Gonzales, and

17  at his direction to other Mexican Mafia members, to preserve,

18  protect, and expand the enterprise's control of criminal activity

19  undertaken within the territory, and to ensure the Mexican Mafia

20  provides protection to members and associates of the enterprise who

21  are incarcerated.

22        e.    Leaders of the Arnold Gonzales Organization

23  disseminate rules and orders to be followed by its members and

24  associates.

25        f.    Members and associates of the Arnold Gonzales

26  Organization frequently engage in the aforementioned criminal

27  activity in the presence of other members and/or associates of the

28  enterprise to enhance their status within the enterprise.

g.   Members and associates of the Arnold Gonzales Organization protect and strengthen the enterprise's standing by following the direction of EME Gonzales; by corresponding with enterprise members and associates through prison visits, telephone calls, and written correspondence; by remitting portions of narcotics sales, robberies, and other illegal activities to EME Gonzales; and by carrying out violent acts against targets who are designated by EME Gonzales.

COUNT ONE

[18 U.S.C. § 1962(d)]

1.    Paragraphs One through Nine of the Introductory Allegations are hereby re-alleged and incorporated by reference as though fully set forth herein.

A.    THE OBJECT OF THE CONSPIRACY

2.    Beginning on a date unknown to the Grand Jury, and continuing to on or about June 17, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants GREY, S. ZEPEDA, J. ZEPEDA, VALLEJO, OLVERA, JULIO BOSQUE, JAVIER BOSQUE, VALENCIA, HAM, MENDOZA, LAUBE, LEYDEL, ORTIZ, ALDRETTE, GARCIA, T. GONZALES, VALERIO, ORTEGA, AMADO, MURILLO, BARRETO, GOTHARD, and others known and unknown to the Grand Jury, being persons employed by and associated with the Arnold Gonzales Organization, an enterprise which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts indictable under the following provisions of federal law:

a.    Title 21, United States Code, Sections 841(a)(1) and 846 (offenses involving the distribution of, possession with intent to distribute, and conspiracy to distribute and/or possess with intent to distribute, controlled substances, including heroin, methamphetamine, cocaine, and cocaine base in the form of crack

1    cocaine);

2          b.    Title 18, United States Code, Section 1956 (money

3    laundering);

4    and multiple acts involving:

5          c.    murder, committed in violation of California Penal

6    Code Sections 21a, 31, 182, 187, 189, 190, and 664; and

7          d.    extortion, committed in violation of California Penal

8    Code Sections 21(a), 31, 182, 518, 519, 520, and 664.

9          3.    It was a further part of the conspiracy that each defendant

10   agreed that a conspirator would commit at least two acts of

11   racketeering activity in the conduct of the affairs of the

12   enterprise.

13   B.    THE MEANS OF THE CONSPIRACY

14         The object of the conspiracy was to be accomplished in substance

15   as follows:

16         1.    Defendant GREY would unite the historic rival gangs of

17   Frogtown, Toonerville, and the Rascals into the Arnold Gonzales

18   Organization and exercise leadership over the enterprise on behalf of

19   EME Gonzales, including by issuing and ensuring the enforcement of

20   orders directed to defendants S. ZEPEDA, J. ZEPEDA, VALLEJO, HAM,

21   MENDOZA, LEYDEL, ORTIZ, and others known and unknown to the Grand

22   Jury, regarding, among other things, the collection of "taxes" and

23   "penalties," the identification of individuals who would hold

24   positions of authority within the enterprise, the amassing and

25   storage of firearms to enforce the authority of the enterprise on the

26   streets, the disciplining and assaulting of members and associates of

27   the enterprise -- or others who were deemed to have interfered with

28   the enterprise's authority and/or criminal activities -- including

12

1  through the planning of assaults and murders of such individuals; and

2  the purchase of large-scale amounts of narcotics for resale.

3      2.    Defendants S. ZEPEDA, J. ZEPEDA, VALLEJO, OLVERA, HAM,

4  MENDOZA, ORTIZ, and LEYDEL would assist in the enforcement of the

5  authority of the enterprise's business, including the collection of

6  "taxes" and "penalties" from both members and associates of the

7  enterprise and individuals engaging in narcotics trafficking or other

8  illicit activities within the territory controlled by the enterprise.

9      3.    Defendants GREY, S. ZEPEDA, J. ZEPEDA, VALLEJO, OLVERA,

10  JULIO BOSQUE, JAVIER BOSQUE, VALENCIA, HAM, LAUBE, ALDRETTE, AMADO,

11  MURILLO, BARRETO, and GOTHARD would sell or help to arrange the sale

12  of narcotics within enterprise territory to drug customers and/or

13  members and associates of the enterprise, thereby generating avenues

14  of revenue for EME Gonzales and the enterprise.

15      4.    Defendant VALLEJO, as well as defendant LAUBE acting at the

16  direction of defendant VALLEJO, would attempt to expand the territory

17  of the enterprise to other areas outside of Northeast Los Angeles,

18  including to the greater Lancaster, California area, and would

19  attempt to enforce control over this expanded territory through the

20  use of intimidation and violence, and threats of intimidation.

21      5.    Defendants OLVERA, MENDOZA, and GARCIA would obtain and

22  maintain firearms and provide them for use by members of the

23  enterprise to both protect and enforce the authority of the

24  enterprise.

25      6.    Defendant LEYDEL would receive, transport, and store

26  firearms given to him by defendant GREY to ensure the existence of a

27  supply of firearms for members and associates of the enterprise and

28

13

1  would relay defendant GREY's messages to other members of the

2  enterprise, including defendant LAUBE.

3    7.   Defendants JULIO BOSQUE, JAVIER BOSQUE, and AMADO would

4  moderate disputes between individuals in the territory controlled by

5  the enterprise and/or involving other neighboring gangs, including

6  the El Sereno-Locke street gang.

7    8.   Defendants T. GONZALES and VALERIO would relay messages to

8  and from EME Gonzales through in-person visits at Pelican Bay State

9  Prison and, along with defendant J. ZEPEDA, would remit "taxes" to

10  EME Gonzales by depositing money into his prison account.

11    9.   Defendant ORTEGA would facilitate three-way calls between

12  defendant VALLEJO and other members and associates of the enterprise,

13  and would collect "taxes" on defendant VALLEJO's behalf when he was

14  incarcerated.

15  C.   OVERT ACTS

16    In furtherance of the conspiracy and to accomplish the object of

17  the conspiracy, defendants GREY, S. ZEPEDA, J. ZEPEDA, VALLEJO,

18  OLVERA, JULIO BOSQUE, JAVIER BOSQUE, VALENCIA, HAM, MENDOZA, LAUBE,

19  LEYDEL, ORTIZ, ALDRETTE, GARCIA, T. GONZALES, VALERIO, ORTEGA, AMADO,

20  MURILLO, BARRETO, GOTHARD, and others known and unknown to the Grand

21  Jury, committed and caused to be committed various overt acts, on or

22  about the following dates, within the Central District of California

23  and elsewhere, including, but not limited to, the following:

24    1.   On September 9, 2010, defendant GREY met with select

25  members and associates of Northeast Los Angeles gangs, including

26  defendant VALENCIA, at a bar in Los Angeles, California, and informed

27  them that he was EME Gonzales' secretary and "mouthpiece," and that

28  EME Gonzales had directed him to broker a "truce" amongst the rival

14

1  gangs so that they could work together to control the illicit
2  activities in the region on behalf of, and for the benefit of, EME
3  Gonzales.

4      2.   Between September 9, 2010, and May 22, 2014, defendant T.
5  GONZALES deposited approximately $2,450 into EME Gonzales' prison
6  account.

7      3.   Between September 10, 2010, and March 6, 2015, defendant
8  VALERIO deposited approximately $133,715 into EME Gonzales' prison
9  account.

10     4.   On October 1, 2010, using coded language in a recorded jail
11  conversation facilitated by defendant ORTEGA, a Toonerville gang
12  member advised defendant GREY that he had a conversation with a
13  Cypress Gang member during which it was discussed how a person who
14  was attempting to use defendant GREY's name without authorization to
15  engage in criminal conduct would be assaulted or murdered, at which
16  time defendant GREY indicated that he approved of the discipline to
17  be meted out.

18     5.   On October 1, 2010, using coded language in a recorded jail
19  conversation facilitated by defendant ORTEGA, defendant GREY
20  instructed a Toonerville gang member to order defendant VALLEJO to
21  "stick to" defendant GREY's instructions because he was not going to
22  support someone who was "half-cocked."

23     6.   Between October 6, 2010, and October 2, 2014, defendant J.
24  ZEPEDA deposited approximately $1,040 into EME Gonzales' prison
25  account.

26     7.   On December 17, 2011, defendant VALLEJO shot defendant
27  GARCIA multiple times after hearing that defendant GARCIA was
28  attempting to challenge defendant VALLEJO's power and authority

1  within the Arnold Gonzales Organization.

2      8.   On or before March 2, 2012, defendant ORTIZ escorted

3  defendant VALLEJO into Rascals gang territory and advised members of

4  the Rascals gang that defendant VALLEJO would be entering Rascals

5  gang territory weekly to collect "taxes" on behalf of EME Gonzales.

6      9.   On May 12, 2012, defendant GREY and a Frogtown gang member

7  went to the residence of an individual who was selling narcotics

8  without paying taxes and informed that individual that he had two

9  weeks to pay $100.

10     10.   On May 26, 2012, at the direction of defendant GREY, a

11  Frogtown gang member shot the individual visited by defendant GREY on

12  May 12, 2012, multiple times in the leg for failing to pay "taxes"

13  owed to the enterprise by the deadline previously-set by defendant

14  GREY.

15     11.  On June 1, 2012, using coded language in a recorded jail

16  conversation, defendants S. ZEPEDA and J. ZEPEDA talked about

17  defendant S. ZEPEDA trafficking in narcotics, to include the pricing

18  for both methamphetamine and cocaine.

19     12.  On July 21, 2012, using coded language in a recorded jail

20  conversation, defendant VALLEJO instructed defendant ORTEGA to

21  facilitate three-way calls on his behalf so that defendant VALLEJO

22  could continue to coordinate the collection of "taxes" from jail.

23     13.  On August 1, 2012, using coded language in a recorded jail

24  conversation, defendant ORTEGA informed defendant VALLEJO that she

25  had collected "tax" payments from two Toonerville gang members and

26  discussed the fact that defendant GREY had been arrested.

27     14.  On August 3, 2012, using coded language in a recorded jail

28  conversation, defendant VALLEJO confirmed with defendant ORTEGA that

16

1  he wanted her to listen to all of the phone calls she facilitated on

2  his behalf and to read all of his letters because he wanted her to be

3  "his other half and always be in the know."

4      15.   On August 3, 2012, using coded language in a recorded jail

5  conversation facilitated by defendant ORTEGA, defendant S. ZEPEDA

6  told defendant VALLEJO that some Toonerville gang members and

7  associates did not appear to be honoring the truce with the Frogtown

8  and Rascals gangs, to which defendant VALLEJO responded that they

9  better abide by EME Gonzales' order or defendant VALLEJO would punish

10  them himself.

11      16.   On August 3, 2012, using coded language in a voicemail

12  message left for a Toonerville OG, defendant VALLEJO complained about

13  not receiving help from the Toonerville OG in helping establish the

14  Toonerville gang's position within the Arnold Gonzales Organization.

15      17.   On August 3, 2012, using coded language in a recorded jail

16  conversation, defendant VALLEJO told defendant ORTEGA that he had not

17  received help from other Toonerville gang members and that he had

18  heard that a Toonerville OG was complaining about defendant VALLEJO

19  wanting a "peace treaty" amongst the rival gangs.

20      18.   On August 3, 2012, using coded language in a recorded jail

21  conversation facilitated by defendant ORTEGA, defendant VALLEJO told

22  an individual about the Arnold Gonzales Organization, variously

23  describing it as the "United Nations," "New World Order," and "United

24  Neighborhoods," and explained that was the "game plan" and "that's

25  the new message that's going out there and that's what's gonna

26  happen, you can mark my words."

27      19.   On August 18, 2012, using coded language in a recorded jail

28  conversation, defendant VALLEJO told an associate that defendant GREY

1  had deposited money into his jail account and had punished defendant
2  GARCIA for unauthorized conduct by fining him.

3      20.  On August 22, 2012, using coded language in a series of
4  recorded jail conversations, defendant VALLEJO told an associate to
5  text a Toonerville gang member and advise that individual that if he
6  did not visit defendant VALLEJO in jail, he would get shot in
7  retaliation similarly to defendant GARCIA.

8      21.  On August 27, 2012, using coded language in a telephone
9  conversation, defendant GREY and an associate discussed the
10  whereabouts of a Mexican Mafia member who was in "bad standing."

11      22.  On August 27, 2012, using coded language in a telephone
12  conversation, defendant GREY and an associate discussed their shared
13  belief that they would be made members of the Mexican Mafia if they
14  murdered the Mexican Mafia member in "bad standing," and thereafter
15  made arrangements to meet to further discuss their plans.

16      23.  On September 10, 2012, using coded language in a recorded
17  jail conversation, an individual advised defendant VALLEJO that
18  defendant GARCIA, with the support of defendant S. ZEPEDA, was still
19  attempting to take a more prominent role in the Toonerville gang's
20  position with the Arnold Gonzales Organization, to which defendant
21  VALLEJO responded that he would attempt to kill those who betrayed
22  him just as he had previously attempted to kill defendant GARCIA.

23      24.  On September 12, 2012, using coded language in a recorded
24  jail conversation, defendant VALLEJO discussed with defendant S.
25  ZEPEDA how defendant OLVERA should "step up" and collect "taxes" from
26  Toonerville gang members and associates.

27      25.  On November 23, 2012, using coded language during an in-
28  person visit at Pelican Bay State Prison, defendant T. GONZALES

1  updated EME Gonzales about an individual working for EME Gonzales at

2  Calipatria State Prison.

3      26.  On November 23, 2012, using coded language during an in-

4  person visit at Pelican Bay State Prison, defendant VALERIO informed

5  EME Gonzales that defendant GREY had attempted to give her "tax"

6  collections but that she declined to accept them because she had not

7  received the order from EME Gonzales to do so, to which EME Gonzales

8  responded that defendant VALERIO had permission to accept "taxes"

9  from defendant GREY.

10     27.  On February 16, 2013, using coded language during an in-

11  person visit at the Pelican Bay State Prison, defendant T. GONZALES

12  talked about defendants GREY and S. ZEPEDA's involvement in the

13  enterprise, the collection of "taxes" on behalf of EME Gonzales, and

14  how a portion of the taxes collected would be used to fund the future

15  travel of defendant T. GONZALES to Pelican Bay State Prison to visit

16  EME Gonzales.

17     28.  On March 4, 2013, using coded language in a telephone

18  conversation, defendant J. ZEPEDA informed defendant S. ZEPEDA that

19  he (J. ZEPEDA) would be delivering methamphetamine to an individual

20  at Homeboy Industries.

21     29.  On March 5, 2013, using coded language in a telephone

22  conversation, defendant S. ZEPEDA asked defendant J. ZEPEDA whether

23  defendant J. ZEPEDA had given "samples" of narcotics to anyone, to

24  which defendant J. ZEPEDA replied "Cuba," referring to defendant

25  JULIO BOSQUE, at which time defendant S. ZEPEDA told defendant J.

26  ZEPEDA to instruct defendant GREY to buy a top-of-the-line scale to

27  weigh narcotics because they would need one.

28     30.  On March 5, 2013, using coded language in a telephone

1   conversation, defendants J. ZEPEDA and S. ZEPEDA discussed plans for

2   defendant J. ZEPEDA to pick up 32 ounces of methamphetamine which

3   defendant J. ZEPEDA would package and then deliver half of the amount

4   (16 ounces) to a drug customer.

5       31.  On March 6, 2013, using coded language in a telephone

6   conversation, defendants S. ZEPEDA and OLVERA made arrangements for

7   "taxes" collected by defendant OLVERA to be picked up by defendant J.

8   ZEPEDA.

9       32.  On March 6, 2013, using coded language in a telephone

10  conversation, defendant S. ZEPEDA called defendant J. ZEPEDA and told

11  him to meet defendant OLVERA at a Starbucks in Arnold Gonzales

12  Organization territory.

13      33.  On March 6, 2013, defendant J. ZEPEDA met defendant OLVERA

14  at a Starbucks in Arnold Gonzales Organization territory and picked

15  up "taxes" from defendant OLVERA, which were then to be given by

16  defendant S. ZEPEDA to defendant GREY.

17      34.  On March 6, 2013, using coded language in a telephone

18  conversation, defendant J. ZEPEDA confirmed with defendant S. ZEPEDA

19  that he had picked up "taxes" from defendant OLVERA, to which

20  defendant S. ZEPEDA instructed defendant J. ZEPEDA to hold onto the

21  money and that he (J. ZEPEDA) should give it to defendant GREY.

22      35.  On March 8, 2013, using coded language in a series of

23  telephone conversations, defendants VALENCIA and S. ZEPEDA discussed

24  the manner in which the narcotics that defendant S. ZEPEDA had

25  purchased were packaged and how defendant S. ZEPEDA planned to divide

26  the narcotics for resale.

27      36.  On March 10, 2013, using coded language in a telephone

28  conversation, defendant S. ZEPEDA asked defendant J. ZEPEDA to

1  retrieve money from a jacket in their mother's closet and to bring
2  the money to him so that defendant S. ZEPEDA could give it to
3  defendant GREY.

4      37.  On March 10, 2013, using coded language in a telephone
5  conversation, defendant S. ZEPEDA told defendant ALDRETTE that "the
6  word" was that defendant ALDRETTE owed $2,500 in "taxes," at which
7  time defendant ALDRETTE agreed to meet to discuss the issue in
8  person.

9      38.  On March 10, 2013, using coded language in a telephone
10 conversation, defendant S. ZEPEDA told defendant ALDRETTE that he
11 would text him defendant JULIO BOSQUE's phone number.

12     40.  On March 10, 2013, using coded language in a telephone
13 conversation, defendant S. ZEPEDA told defendant JULIO BOSQUE that he
14 had just talked to, and was about to meet, defendant ALDRETTE.

15     41.  On March 10, 2013, using coded language in a telephone
16 conversation, defendant JULIO BOSQUE asked defendant S. ZEPEDA
17 whether defendant ALDRETTE had any money and instructed defendant
18 JULIO BOSQUE to call him back after defendant JULIO BOSQUE talked to
19 defendant ALDRETTE to see why defendant ALDRETTE wanted defendant
20 JULIO BOSQUE's phone number.

21     42.  On March 10, 2013, using coded language in a telephone
22 conversation, defendant JULIO BOSQUE told defendant S. ZEPEDA that
23 defendant ALDRETTE had asked for heroin and that defendant JULIO
24 BOSQUE had told defendant ALDRETTE that he had only three units
25 available.

26     43.  On March 10, 2013, using coded language in a telephone
27 conversation, defendant JULIO BOSQUE asked defendant S. ZEPEDA to
28 contact defendant VALENCIA to see if she could call defendant J.

ZEPEDA regarding the money owed by defendant ALDRETTE and further noted that he had talked to defendant MENDOZA and that the amount defendant ALDRETTE was going to be "taxed"/penalized would be raised to $5,000, to which defendant S. ZEPEDA agreed.

44. On March 11, 2013, using coded language in a telephone conversation, defendant S. ZEPEDA informed defendant J. ZEPEDA that he would be meeting with defendant ALDRETTE the next day at Homeboy Industries to discuss the money owed by defendant ALDRETTE.

45. On March 11, 2013, defendant OLVERA distributed narcotics to an individual in a hand-to-hand transaction in Arnold Gonzales Organization territory.

46. On March 12, 2013, using coded language in a telephone conversation, defendant S. ZEPEDA and an associate made arrangements to meet so that defendant S. ZEPEDA could give him money, with the two ending the call with each proclaiming, "Frogs up."

47. On March 12, 2013, using coded language in a telephone conversation, defendant VALENCIA told defendant S. ZEPEDA that she would instruct a drug supplier to provide defendant S. ZEPEDA with five units of narcotics for $25 and further noted that she had raised the price for another drug customer to "$180" per "ball" and that customer should give defendant S. ZEPEDA "180 and 50 for the ball."

48. On March 13, 2013, using coded language in a telephone conversation, defendant J. ZEPEDA asked defendant S. ZEPEDA to prepare $100 worth of cocaine for a drug customer, to which defendant S. ZEPEDA agreed.

49. On March 14, 2013, defendant OLVERA distributed narcotics to a Toonerville gang member in a hand-to-hand transaction in Arnold Gonzales Organization territory.

22

50.  On March 25, 2013, using coded language in a telephone conversation, defendants S. ZEPEDA and VALENCIA made arrangements for defendant S. ZEPEDA to purchase narcotics from a narcotics supplier and discussed weighing, separating, and packaging the narcotics.

51.  On March 26, 2013, using coded language in a telephone conversation, defendants JULIO BOSQUE and S. ZEPEDA discussed plans to purchase cocaine from a supplier with connections in Mexico with defendant JULIO BOSQUE noting that the supplier charged less for an ounce than what defendant S. ZEPEDA had been paying.

52.  On March 29, 2013, using coded language in a telephone conversation, defendant S. ZEPEDA instructed defendant VALENCIA to weigh a gram of cocaine for a drug customer and to bring it to defendant S. ZEPEDA's house, to which defendant VALENCIA agreed.

53.  On March 29, 2013, using coded language in a telephone conversation, defendant J. ZEPEDA asked defendant S. ZEPEDA for $60 worth of cocaine, to which defendant S. ZEPEDA relayed that defendant VALENCIA would need to go get it and that he would call defendant J. ZEPEDA when it was ready.

54.  On April 4, 2013, using coded language in a telephone conversation, defendants OLVERA and GARCIA talked about the .22 caliber rifle that defendant GARCIA had given to defendant OLVERA to be used to help the enterprise to defend its turf against rivals, with defendant GARCIA reminding defendant OLVERA that he had given one of the two rifles he had fixed to defendant OLVERA and that all of the firearms he provided "to the hood" were provided so that "we can put in work."

55.  On April 4, 2013, using coded language in a telephone conversation, defendant GARCIA complained to defendant OLVERA that he

1   was supposed to be leading "the team" with defendant OLVERA and

2   informed defendant OLVERA that he currently had a firearm, asked

3   defendant OLVERA if he "wanted to take care of some business," and

4   inquired of defendant OLVERA as to who shot "Little G," referring to

5   a deceased Toonerville gang member.

6        56.  On April 4, 2013, using coded language in a telephone

7   conversation, defendant GARCIA informed defendant OLVERA that he had

8   a problem with defendant VALLEJO; and defendant GARCIA further

9   informed defendant OLVERA that he did not want drama anymore and

10  would not even complain about "Desiree" dying or "getting shot," but

11  that he did want to know who shot "Little G" so that he could

12  retaliate.

13       57.  On April 5, 2013, using coded language in a telephone

14  conversation, defendant GOTHARD negotiated the purchase of narcotics

15  from defendant OLVERA on behalf of a drug customer.

16       58.  On April 5, 2013, using coded language in a telephone

17  conversation, defendant BARRETO asked defendant OLVERA if he had

18  methamphetamine available for sale, to which defendant OLVERA

19  confirmed that he did.

20       59.  On April 5, 2013, using coded language in a series of text

21  communications, defendant OLVERA negotiated the sale of narcotics

22  with a drug customer and instructed the drug customer to bring the

23  "taxes" when he came to pick up the narcotics.

24       60.  On April 7, 2013, using coded language in a telephone

25  conversation, defendant VALLEJO informed defendant S. ZEPEDA that he

26  was in Lancaster, California; that he had a dispute with an armed

27  unknown individual regarding territory; that he was there with

28  defendant LAUBE, to whom he was giving the names of the individuals

1  in the area to be "taxed" (and the amount of "taxes" to be paid) on

2  behalf of EME Gonzales; and that he was attempting to establish

3  defendant LAUBE's authority in the area in the event that defendant

4  LAUBE was challenged by rival gang members who may be working for a

5  different Mexican Mafia member or claim defendant LAUBE was

6  infringing upon their territory.

7      61.  On April 7, 2013, using coded language in a telephone

8  conversation, defendant VALLEJO told defendant S. ZEPEDA that he and

9  defendant LAUBE were being challenged for the right to sell narcotics

10  in Lancaster, California, by Pacoima Trece gang members working for

11  Mexican Mafia member Michael Torres, aka "Mosca," aka "Fly," and that

12  the "whole game plan" was to enrich the Arnold Gonzales Organization

13  by selling narcotics in Lancaster, California.

14      62.  On April 7, 2013, using coded language in a telephone

15  conversation, defendant VALLEJO informed defendant S. ZEPEDA that

16  defendant J. ZEPEDA was selling cocaine, that the sale of

17  methamphetamine was becoming a "headache," and that he (VALLEJO)

18  preferred to sell cocaine.

19      63.  On April 7, 2013, using coded language in a telephone

20  conversation, defendant GARCIA asked defendant S. ZEPEDA if everyone

21  was abiding by EME Gonzales' orders, to which defendant S. ZEPEDA

22  responded that they were.

23      64.  On April 7, 2013, using coded language in a telephone

24  conversation, defendants BARRETO and OLVERA talked about money owed

25  to defendant OLVERA which defendant BARRETO was collecting for

26  narcotics previously fronted to drug customers.

27      65.  On April 7, 2013, using coded language in a telephone

28  conversation, defendants OLVERA and MURILLO discussed money owed to

1 | defendant OLVERA for narcotics he previously had supplied to
2 | defendant MURILLO to sell.

3 |     66.  On April 8, 2013, using coded language in a telephone
4 | conversation, defendant BARRETO informed defendant OLVERA that an
5 | individual was sending defendant BARRETO money to give for the
6 | purchase of three units of narcotics from defendant OLVERA and that
7 | the individual wanted to engage in additional narcotics transactions
8 | in the future.

9 |     67.  On April 9, 2013, using coded language in a telephone
10 | conversation, defendant VALLEJO informed defendant S. ZEPEDA that he
11 | had gotten into a dispute with an armed rival gang member in
12 | Lancaster, California, regarding control over territory and that he
13 | had told defendant LAUBE that he (defendant VALLEJO) was taking
14 | responsibility for creating a clique of the Toonerville gang in
15 | Lancaster for the purpose of selling narcotics and enriching the
16 | Arnold Gonzales Organization.

17 |     68.  On April 9, 2013, using coded language in a telephone
18 | conversation, defendant S. ZEPEDA told defendant VALLEJO that
19 | defendant VALLEJO needed to figure out what was going on with
20 | defendant LAUBE, that LAUBE should be reminded that several
21 | Toonerville gang members were working for the enterprise; that if
22 | something went wrong, no one would support defendant LAUBE; and that
23 | defendant LAUBE would still have to pay a monthly tax because he was
24 | a Toonerville gang member, even if he chose to not to perform the
25 | tasks he had been assigned on behalf of the enterprise.

26 |     69.  On April 9, 2013, using coded language in a telephone
27 | conversation, defendant VALLEJO informed defendant S. ZEPEDA that if
28 | defendant LAUBE did not want to be a part of the Arnold Gonzales

1   Organization (referred to as "the team"), defendant VALLEJO would

2   make defendant LAUBE pay a monetary fine.

3         70.   On April 9, 2013, using coded language in a telephone

4   conversation, defendant VALLEJO informed defendant S. ZEPEDA that he

5   was calling from defendant LAUBE's house, at which time defendant

6   LAUBE got on the phone, informed defendant S. ZEPEDA that he would

7   continue to pay his "taxes," and stated that he had given defendant

8   VALLEJO his most recent "tax" payment on the 25th of the month.

9         71.   On April 9, 2013, using coded language in a series of text

10  communications, defendants S. ZEPEDA and OLVERA made plans to meet up

11  so that defendant OLVERA could provide "taxes" he had collected to

12  defendant S. ZEPEDA.

13        72.   On April 9, 2013, in Arnold Gonzales Organization

14  territory, defendant OLVERA met with defendant S. ZEPEDA and paid

15  defendant S. ZEPEDA "taxes" to be given to EME Gonzales.

16        73.   On April 9, 2013, using coded language in a telephone

17  conversation, defendant OLVERA agreed to sell heroin to defendant

18  MURILLO so that it could be further distributed.

19        74.   On April 9, 2013, in response to a text communication from

20  a drug customer, defendant OLVERA met with a drug customer in Arnold

21  Gonzales Organization territory and sold him five balloons of heroin

22  for $45.

23        75.   On April 10, 2013, using coded language in a text

24  communication, defendant VALLEJO informed defendant S. ZEPEDA that he

25  was on his way to purchase a firearm and was awaiting orders from

26  defendant J. ZEPEDA to carry out an act of violence.

27        76.   On April 10, 2013, using coded language in a text

28  communication, defendant VALLEJO told defendant S. ZEPEDA that he

1  planned to go to Lancaster, California, with a firearm and confront
2  an armed rival gang member who had challenged him for territory.

3      77.  On April 11, 2013, using coded language in a series of text
4  communications, defendant VALLEJO explained to defendant S. ZEPEDA
5  that he had a document which listed the names of individuals who were
6  paying "taxes" and the amount of "taxes" they were paying to the
7  enterprise, explained that he had recruited defendant LAUBE to deal
8  with the anticipated problems that accompanied expanding the
9  enterprise's territory, and noted that he was proceeding without
10  money or help out of loyalty to EME Gonzales.

11      78.  On April 11, 2013, using coded language in a telephone
12  conversation, defendant OLVERA agreed to provide heroin to defendant
13  MURILLO for redistribution.

14      79.  On April 11, 2013, at his residence, defendant OLVERA
15  distributed heroin to defendant MURILLO.

16      80.  On April 11, 2013, defendant MURILLO possessed with the
17  intent to distribute approximately 5.6 grams of heroin and 1.99 grams
18  of cocaine.

19      81.  On April 12, 2013, using coded language in a telephone
20  conversation, defendant GREY informed defendant S. ZEPEDA that he
21  (GREY) was paying the "taxes" being collected for EME Gonzales and
22  agreed to meet with defendant S. ZEPEDA after defendant GREY stopped
23  off first at Homeboy Industries.

24      82.  On April 12, 2013, using coded language in a text
25  communication, defendant LAUBE told defendant S. ZEPEDA that
26  defendant LAUBE needed to obtain some narcotics from defendant S.
27  ZEPEDA as soon as possible.

28      83.  On April 12, 2013, using coded language in a telephone

1   conversation, defendant LAUBE discussed with defendant S. ZEPEDA the
2   drug market in Lancaster, California, that defendant LAUBE was
3   looking to purchase methamphetamine and cocaine, that defendant S.
4   ZEPEDA had high quality methamphetamine and cocaine, which was good
5   for "cooking" into rock cocaine, and that defendant S. ZEPEDA would
6   sell defendant LAUBE four ounces of methamphetamine for $1,600 later
7   that day at defendant S. ZEPEDA's residence.

8       84.   On April 12, 2013, using coded language in a telephone
9   conversation, defendant S. ZEPEDA informed defendant J. ZEPEDA that
10  he had negotiated a four ounce purchase of methamphetamine for
11  defendant J. ZEPEDA and that he would help defendant J. ZEPEDA sell
12  the methamphetamine for $1,650, to which defendant J. ZEPEDA
13  responded that the narcotics were already weighed and packaged but
14  that he had to retrieve them.

15      85.   On April 12, 2013, using coded language in a telephone
16  conversation, defendant S. ZEPEDA told defendant J. ZEPEDA that he
17  would introduce him to defendant LAUBE and that he would give
18  defendant J. ZEPEDA $50 of the $1650 that was the subject of their
19  drug transaction because defendant J. ZEPEDA was helping defendant
20  GREY sell narcotics.

21      86.   On April 12, 2013, using coded language in a text
22  communication, defendant S. ZEPEDA informed defendant LAUBE that
23  defendant S. ZEPEDA's narcotics supplier set the price for four
24  ounces of methamphetamine at $1,650.

25      87.   On April 12, 2013, using coded language in a telephone
26  conversation, defendant S. ZEPEDA asked defendant J. ZEPEDA to
27  deliver four ounces of methamphetamine to defendant S. ZEPEDA's
28  residence.

88.   On April 12, 2013, using coded language in a text communication, defendant LAUBE informed defendant S. ZEPEDA that he was on his way to defendant S. ZEPEDA's residence to pick up four ounces of methamphetamine.

89.   On April 12, 2013, defendants J. ZEPEDA and S. ZEPEDA met with defendant LAUBE and sold defendant LAUBE 107.5 grams of methamphetamine for $1,650.

90.   On April 13, 2013, defendant LAUBE possessed 107.5 grams of methamphetamine.

91.   On April 13, 2013, using coded language in a recorded jail conversation, defendant VALLEJO told an individual that he did not care ("I don't give a fuck") if people knew that he had shot defendant GARCIA because "aint nobody gonna go testify".

92.   On April 14, 2013, using coded language in a text communication, defendant LAUBE informed defendant S. ZEPEDA that he was collecting money ("feira") on behalf of the enterprise.

93.   On April 14, 2013, using coded language in a telephone conversation, defendant S. ZEPEDA informed defendant LAUBE that he would give defendant LAUBE one ounce of methamphetamine, and that he would instruct defendant J. ZEPEDA to give defendant LAUBE another ounce of methamphetamine, at which time defendant LAUBE told defendant S. ZEPEDA that he was going to have someone break the narcotics into seven to eight pieces for redistribution and that he was going to start collecting "taxes."

94.   On April 14, 2013, using coded language in a telephone conversation, defendants S. ZEPEDA and J. ZEPEDA discussed defendant LAUBE's order for two ounces of methamphetamine.

95.   On April 14, 2013, using coded language in a telephone

conversation, defendant MURILLO advised defendant OLVERA that he had been arrested immediately after leaving defendant OLVERA's residence and that they had caught him with crack cocaine and heroin which had been provided by defendant OLVERA.

96.  On April 14, 2013, using coded language in a telephone conversation, defendant MURILLO asked defendant OLVERA how much he owed for the heroin seized by law enforcement, to which defendant OLVERA responded that he owed $500.

97.  On April 15, 2013, using coded language in a telephone conversation, defendant S. ZEPEDA asked defendant VALENCIA to prepare four ounces of methamphetamine ("a 4-0") for a drug customer, to which defendant VALENCIA agreed.

98.  On April 15, 2013, using coded language in a telephone conversation, defendants BARRETO and OLVERA discussed defendant BARRETO's efforts to collect money from an individual for narcotics previously fronted as well as for a future order of narcotics, including how the money might be sent over Western Union.

99.  On April 17, 2013, using coded language in a recorded jail conversation, defendant VALLEJO instructed an associate to have defendant LAUBE visit him because defendant VALLEJO had made a new contact in jail and that the connection would be beneficial; further told the associate about the new Northeast enterprise territory in Lancaster, California which he had established with defendant LAUBE, and which defendant VALLEJO would take the associate to visit when defendant VALLEJO got out of jail; and told the associate that they would be responsible for administering discipline.

100. On April 17, 2013, using coded language in a telephone conversation, defendant BARRETO agreed to leave $800 with an

1  individual identified as "Danny" for defendant OLVERA to pick up.

2      101. On April 18, 2013, using coded language in a telephone

3  conversation, defendant LAUBE told defendant S. ZEPEDA that he had

4  not been contacting individuals over the telephone in an effort to

5  avoid law enforcement detection since he was arrested, at which time

6  defendant S. ZEPEDA told defendant LAUBE that he wanted to talk with

7  him in person.

8      102. On April 18, 2013, using coded language in a telephone

9  conversation, defendant S. ZEPEDA agreed to sell defendant LAUBE $100

10  worth of cocaine.

11      103. On April 18, 2013, using coded language in a telephone

12  conversation, defendant LAUBE told defendant S. ZEPEDA that he would

13  call defendant J. ZEPEDA and order one unit of narcotics, but would

14  shoot over more money to cover what he already owed, at which time

15  defendant S. ZEPEDA told defendant LAUBE that he had already told

16  defendant J. ZEPEDA to give defendant LAUBE a quarter pound of

17  narcotics.

18      104. On April 18, 2013, using coded language in a telephone

19  conversation, defendant JAVIER BOSQUE asked a Highland Park gang

20  member (hereinafter "the Highland Park gang member" or "the gang

21  member") whether he had the money needed to complete a quarter pound

22  of methamphetamine transaction set for April 19, 2013.

23      105. On April 18, 2013, using coded language in a text

24  communication, defendants OLVERA and MURILLO discussed the crack

25  cocaine defendant OLVERA had supplied to defendant MURILLO.

26      106. On April 18, 2013, using coded language in a text

27  communication, defendant MURILLO informed defendant OLVERA that he

28  had obtained and sold heroin.

107. On April 18, 2013, using coded language in a telephone conversation, defendant GOTHARD brokered a narcotics transaction with defendant OLVERA on behalf of a drug customer.

108. On April 18, 2013, using coded language in a telephone conversation, defendant BARRETO asked defendant OLVERA if he had methamphetamine, to which defendant OLVERA stated that he was not available and suggested that defendant BARRETO call defendant MURILLO for the narcotics.

109. On April 19, 2013, using coded language in a telephone conversation, in response to the Highland Park gang member telling him that his car was "shot up" earlier in the day, defendant JAVIER BOSQUE told the gang member that he would call defendant JULIO BOSQUE to get more details about the shooting but that the drug deal remained set for that day.

110. On April 19, 2013, using coded language in a text communication, defendant JAVIER BOSQUE and the Highland Park gang member set up a meeting place for the drug transaction.

111. On April 19, 2013, defendants JAVIER BOSQUE and JULIO BOSQUE met with the Highland Park gang member, at which time defendant JULIO BOSQUE informed the gang member that he could provide two ounces of methamphetamine for $850 and defendant JAVIER BOSQUE informed the gang member that he would provide protection such that the gang member would not "have to worry about no one fucking with you" if he paid defendant JAVIER BOSQUE $400 per month.

112. On April 19, 2013, defendants JAVIER BOSQUE and JULIO BOSQUE went to defendant J. ZEPEDA's residence, where they picked up 55.4 grams of methamphetamine from defendant J. ZEPEDA.

113. On April 19, 2013, using coded language in a telephone

1  conversation, defendant JAVIER BOSQUE informed the Highland Park gang

2  member that he and defendant JULIO BOSQUE were on their way back to

3  meet him.

4      114. On April 19, 2013, defendants JULIO BOSQUE and JAVIER

5  BOSQUE met with the Highland Park gang member and sold 55.4 grams of

6  methamphetamine to this individual for $850.

7      115. On April 19, 2013, defendant JULIO BOSQUE met with the

8  Highland Park gang member, accepted $400 in "protection money,"

9  assured the gang member that the El Sereno gang would not "fuck with"

10  him because defendant JULIO BOSQUE would inform that gang that the

11  gang member was working with "them," and would further contact

12  defendant AMADO, an enterprise associate with ties to the El Sereno

13  gang, so that the gang member's house would be "flagged" as off-

14  limits.

15      116. On April 19, 2013, defendant JULIO BOSQUE met with the

16  Highland Park gang member, offered the gang member a .45 caliber gun

17  for $800, told the gang member that if anyone questioned him to have

18  them contact defendant JULIO BOSQUE so that he could deal with the

19  "issue," gave the gang member his phone number, and then informed the

20  gang member that he would try and find a firearm for him.

21      117. On April 19, 2013, using coded language in a text

22  communication, defendant LAUBE asked defendant S. ZEPEDA if he could

23  purchase more cocaine from defendant S. ZEPEDA, to which defendant S.

24  ZEPEDA affirmed that defendant LAUBE could do so.

25      118. On April 19, 2013, defendant MURILLO went to defendant

26  BARRETO's residence for the purpose of providing narcotics.

27      119. On April 20, 2013, defendant MURILLO went to defendant

28  BARRETO's residence for the purpose of providing narcotics.

120. On April 20, 2013, defendants J. ZEPEDA, JULIO BOSQUE, and JAVIER BOSQUE took the Highland Park gang member to the residence of defendant AMADO, where he was introduced to defendant AMADO as someone who "worked for" defendant JULIO BOSQUE.

121. On April 20, 2013, defendant AMADO sold defendant J. ZEPEDA approximately one pound of methamphetamine.

122. On April 20, 2013, defendant J. ZEPEDA dropped off a small bag of methamphetamine to defendant GREY.

123. On April 20, 2013, defendant J. ZEPEDA dropped off approximately one pound of methamphetamine at an associate's residence for storage.

124. On April 20, 2013, using coded language in a telephone conversation, defendants MENDOZA and GREY talked about a gang injunction, and defendant MENDOZA indicated that would use Homeboy Industries as an "alibi" should law enforcement accuse him of violating the injunction.

125. On April 21, 2013, defendant AMADO confronted the Highland Park gang member about a shooting that targeted defendant AMADO's cousin, and defendant AMADO informed the gang member that he would not receive a "full pass" and "protection" in El Sereno-Locke gang territory until he paid a "tax."

126. On April 21, 2013, using coded language in a telephone conversation, defendant AMADO told the Highland Park gang member that the "tax" he was required to pay was $1,800; and when the gang member responded that he did not have the money, defendant AMADO insisted that the "tax" had to be paid, stated that he worked for the Mexican Mafia, and noted that he had served a prison sentence in Pelican Bay State Prison.

127. On April 21, 2013, defendants J. ZEPEDA, S. ZEPEDA, and JULIO BOSQUE took the Highland Park gang member to defendant AMADO's residence, where, using coded language, defendant S. ZEPEDA informed the gang member that he needed to pay the money owed to defendant AMADO for both his protection and to demonstrate that he was supporting the Arnold Gonzales Organization; and defendant S. ZEPEDA further explained that if this gang member could pay $1,000, and defendant S. ZEPEDA would cover the remaining $800.

128. On April 23, 2013, defendant S. ZEPEDA gave the Highland Park gang member $800 to be used to pay defendant AMADO.

129. On April 23, 2013, defendant AMADO accepted $1,800 from the Highland Park gang member and stated that he would ensure that the gang member and his family members would not be assaulted or harassed in El Sereno gang territory.

130. On April 24, 2013, using coded language in a telephone conversation, defendant BARRETO informed defendant OLVERA that he was collecting money to pay defendant OLVERA for previously-fronted narcotics and that he was going to take a portion of the money for his "cut."

131. On April 25, 2013, at defendant JAVIER BOSQUE's residence, defendants S. ZEPEDA, J. ZEPEDA, JULIO BOSQUE, and JAVIER BOSQUE met up with the Highland Park gang member, at which time, defendant JULIO BOSQUE informed the gang member that defendant JULIO BOSQUE was going to pick up narcotics for the gang member and that he would return to the location to distribute it.

132. On April 25, 2013, in territory controlled by the Arnold Gonzales Organization, defendant JAVIER BOSQUE sold a Mossberg Model 930 12-gauge shotgun with serial number AF086285 to the Highland Park

1   gang member for $1,400 and instructed the gang member to scratch the
2   serial number off the shotgun because defendant JAVIER BOSQUE did not
3   want "that shit to come back to" him.

4       133. On April 25, 2013, in the parking lot of a restaurant
5   located in territory controlled by the Arnold Gonzales Organization,
6   defendant JULIO BOSQUE met and sold 56.7 grams of methamphetamine to
7   the Highland Park gang member for $1,100.

8       134. On April 25, 2013, using coded language in a telephone
9   conversation, defendant BARRETO informed defendant OLVERA that he had
10  collected all of the money owed to defendant OLVERA and that he had
11  made a written record of it for defendant OLVERA.

12      135. On April 25, 2013, using coded language in a text
13  communication, defendant BARRETO ordered methamphetamine from
14  defendant OLVERA.

15      136. On April 28, 2013, using coded language in a telephone
16  conversation, defendant OLVERA informed defendant GOTHARD that he
17  would be available in case anyone needed narcotics for purchase.

18      137. On May 2, 2013, using coded language in a telephone
19  conversation, defendant GOTHARD informed defendant OLVERA that he was
20  on his way to defendant OLVERA's residence to purchase narcotics for
21  redistribution.

22      138. On May 9, 2013, defendant BARRETO possessed with intent to
23  distribute approximately 3.2 grams of a mixture and substance
24  containing a detectable amount of heroin.

25      139. On May 9, 2013, defendant OLVERA possessed a .22 caliber
26  model 380 Mossberg rifle that had a 18.5 inch barrel, was 38 inches
27  in length, and had serial number M57609; a 9mm caliber model P89DC
28  Ruger pistol, with serial number 30327488; ammunition of various

1  calibers; 4.4 grams of methamphetamine; a digital scale; and
2  narcotics pay-owe sheets.

3     140. On May 11, 2013, using coded language in an in-person visit
4  at Pelican Bay State Prison, defendant T. GONZALES briefed EME
5  Gonzales about the status of "taxes" being collected by defendants
6  GREY and S. ZEPEDA on behalf of EME Gonzales and the Mexican Mafia,
7  and defendant T. GONZALES informed EME Gonzales that defendant S.
8  ZEPEDA was paying the required "taxes" to EME Gonzales.

9     141. On May 11, 2013, using coded language in an in-person visit
10 at Pelican Bay State Prison, defendant T. GONZALES and EME Gonzales
11 talked about the status of a "secretary."

12    142. On May 11, 2013, during an in-person visit at Pelican Bay
13 State Prison, defendant VALERIO showed to EME Gonzales a message she
14 had written on her hand to indicate the amount of "taxes" she had
15 stored at her home on his behalf.

16    143. On May 13, 2013, using coded language in a telephone
17 conversation, defendant JULIO BOSQUE directed the Highland Park gang
18 member to go to defendant JAVIER BOSQUE's residence to pay $400 in
19 "taxes" which were late.

20    144. On May 13, 2013, defendant JAVIER BOSQUE collected $400 in
21 "taxes" from the Highland Park gang member and informed the gang
22 member that he should speak with defendants S. ZEPEDA, GREY, or JULIO
23 BOSQUE to let them know that a $400 monthly tax was too much.

24    145. On May 16, 2013, in territory controlled by the Arnold
25 Gonzales Organization, defendant JAVIER BOSQUE sold to the Highland
26 Park gang member a Ruger Blackhawk Model .45 caliber revolver with
27 serial number 47-55611, which was loaded with six rounds of .45
28 caliber ammunition.

146. On May 16, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant JULIO BOSQUE told the Highland Park gang member that he had just under a full ounce of methamphetamine in his possession.

147. On May 16, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant JULIO BOSQUE spoke with defendant J. ZEPEDA on the telephone and informed the gang member that he was going to go to defendant J. ZEPEDA's residence to get more narcotics, which he would bring back to sell to the gang member.

148. On May 16, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant JULIO BOSQUE sold the Highland Park gang member 24.7 grams of methamphetamine.

149. On May 20, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant JULIO BOSQUE informed the Highland Park gang member that the gang member needed to pay a "penalty" for not picking up narcotics to sell on a weekly basis.

150. On May 21, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant J. ZEPEDA informed the Highland Park gang member that he had two ounces of methamphetamine for sale, that the gang member needed to pay a $800 fine levied by defendant GREY when the gang member failed to purchase narcotics with sufficient frequency, and that if the gang member did not pay the fine, it could be increased and/or he could be "greenlighted."

151. On May 24, 2013, using coded language in a series of

telephone conversations, defendant J. ZEPEDA negotiated the sale of two ounces of methamphetamine to the Highland Park gang member for $1,100.

152. On May 24, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant J. ZEPEDA and the Highland Park gang member discussed the possibility of having his monthly "tax" lowered from $400 with defendant J. ZEPEDA agreeing to talk to defendant S. ZEPEDA about the issues.

153. On May 24, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant J. ZEPEDA sold the Highland Park gang member 51.7 grams of methamphetamine for $1,100.

154. On May 24, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant J. ZEPEDA collected $800 from the Highland Park gang member on defendant GREY's behalf as a fine for not buying narcotics on a timely basis.

155. On May 24, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, defendant J. ZEPEDA asked the Highland Park gang member whether he was going to buy more methamphetamine, to which the gang member replied that he would buy methamphetamine from defendant J. ZEPEDA every two weeks.

156. On June 4, 2013, during an in-person meeting in territory controlled by the Arnold Gonzales Organization, while possessing a handgun in the waistband of his pants, defendant J. ZEPEDA sold 53.7 grams of methamphetamine to the Highland Park gang member.

157. On June 4, 2013, using coded language in a telephone conversation, defendant HAM told the Highland Park gang member that law enforcement had raided defendant J. ZEPEDA's house and asked if

1    the gang member had any narcotics available because defendant HAM had

2    customers who were ready to buy, to which the gang member told

3    defendant HAM to call defendant MENDOZA to get defendant JULIO

4    BOSQUE's phone number.

5       158. On June 5, 2013, at Homeboy Industries, defendant GREY

6    received a call from defendant J. ZEPEDA in which defendant J. ZEPEDA

7    claimed that he had just been robbed of a quarter pound of

8    methamphetamine.

9       159. On June 5, 2013, during an in-person meeting in territory

10   controlled by the Arnold Gonzales Organization, defendant GREY

11   instructed the Highland Park gang member to go home to retrieve his

12   firearms and go to defendant J. ZEPEDA's residence.

13      160. On June 5, 2013, in territory controlled by the Arnold

14   Gonzales Organization, defendant J. ZEPEDA possessed 5.4 grams of

15   methamphetamine; a Norinco North China Industries 7.62 caliber, Model

16   56S AK-type assault rifle, with serial number 565302183; a 12-gauge,

17   Model 500 Mossberg sawed-off shotgun, with serial number K120050; a

18   10-caliber, Model 20 Glock semi-automatic handgun, with serial number

19   BNR353; several digital scales; ammunition of various calibers; and

20   Frogtown gang paraphernalia.

21      161. On June 6, 2013, during an in-person meeting in territory

22   controlled by the Arnold Gonzales Organization, defendant J. ZEPEDA

23   instructed defendant JULIO BOSQUE to collect $400 from the Highland

24   Park gang member as protection money.

25      162. On June 6, 2013, during an in-person meeting in territory

26   controlled by the Arnold Gonzales Organization, defendant J. ZEPEDA

27   instructed the Highland Park gang member to make a payment of

28   protection money to defendant JULIO BOSQUE.

163. On June 6, 2013, in the parking lot of a restaurant located in territory controlled by the Arnold Gonzales Organization, defendant JULIO BOSQUE met with the Highland Park gang member and collected $400 as a "penalty" to be paid to defendant GREY.

164. On June 10, 2013, using coded language in a telephone conversation, defendant LEYDEL informed defendant GREY that defendant LAUBE unsuccessfully had been trying to reach defendant GREY.

165. On June 11, 2013, using coded language in a series of telephone conversations, defendant HAM informed defendant GREY that the Highland Park gang member did not pay his taxes, to which defendant GREY ordered defendant HAM to instruct the gang member that he had to pay and that defendant GREY would "escort" the gang member, if need be.

166. On June 11, 2013, using coded language in a series of telephone conversations, defendant GREY told defendant HAM that he would give defendant HAM some money ("a little something for it") for getting the Highland Park gang member to pay his "taxes" and asked defendant HAM to call defendant J. ZEPEDA to fill him in, at which time defendant HAM agreed to do so.

167. On June 11, 2013, using coded language in a telephone conversation, defendants GREY and J. ZEPEDA talked about the collection and pooling of "taxes" to make a large narcotics purchase, with defendant GREY stating that a lot of people were ready to "go at it again" and that they were waiting on defendant J. ZEPEDA to get the narcotics from defendant JULIO BOSQUE.

168. On June 11, 2013, using coded language in a telephone conversation, defendant GREY asked defendant JULIO BOSQUE whether he had collected the "taxes" from the distribution of narcotics; and

when defendant JULIO BOSQUE stated that he had collected half of the amount of "taxes" owed, defendant GREY responded that "they all needed to get it done."

169. On June 11, 2013, using coded language in a telephone conversation, defendant HAM informed the Highland Park gang member that defendant GREY wanted to pay him to serve as an enforcer.

170. On June 11, 2013, using coded language in a telephone conversation, defendant HAM informed the Highland Park gang member that defendant GREY had told him that defendant GREY did not want anyone to have defendant GREY's phone number and that the Highland Park gang member needed to pay money owed to defendant GREY.

171. On June 12, 2013, at a strip club in Los Angeles, California, defendant GREY instructed defendants JULIO BOSQUE and HAM, and the Highland Park gang member to pay defendant GREY $500 for the purpose of helping defendant GREY purchase two pounds of methamphetamine from defendant AMADO.

172. On June 12, 2013, at a strip club in Los Angeles, California, defendant JULIO BOSQUE paid $500 to defendant GREY.

173. On June 12, 2013, using coded language in a telephone conversation, defendant HAM informed defendant GREY that the Highland Park gang member wanted to give defendant GREY money and to speak with defendant GREY, to which defendant GREY responded that he did not have time for the Highland Park gang member.

174. On June 12, 2013, using coded language in a telephone conversation, defendant GREY ordered defendant HAM to either collect the money owed by the Highland Park gang member or have defendant JULIO BOSQUE collect the money, with defendant GREY stating that he would pay defendant HAM for taking care of the task.

43

175. On June 13, 2013, using coded language in a telephone conversation, defendant HAM informed defendant GREY that the Highland Park gang member would be bringing money that he owed to defendant GREY, to which defendant GREY instructed defendant HAM to call defendant JULIO BOSQUE to let him know that was happening.

176. On June 13, 2013, in territory controlled by the Arnold Gonzales Organization, defendant HAM collected $500 from the Highland Park gang member for the purpose of enabling defendant GREY to purchase two pounds of methamphetamine.

177. On June 13, 2013, using coded language in a telephone conversation, defendant GREY told defendant LEYDEL that he had just gotten out of the hospital, and that he would need until tomorrow to touch base with defendant LAUBE.

178. On June 13, 2013, using coded language in a telephone conversation, defendant HAM informed defendant GREY that the Highland Park gang member had paid $400 toward the purchase of narcotics, to which defendant GREY insisted that the gang member owed another $400 for "monthly" taxes and that "the work" and "the monthly" were different.

179. On June 13, 2013, using coded language in a telephone conversation, defendant HAM relayed to the Highland Park gang member defendant GREY's message that the gang member owed another $400.

180. On June 13, 2013, using coded language in a telephone conversation, defendant HAM told defendant GREY to see whether the Highland Park gang member had given taxes to defendant J. ZEPEDA, and defendant HAM added that if defendant J. ZEPEDA said otherwise, defendant HAM would go to the gang member's house and make him "cough it up."

44

181. On June 13, 2013, using coded language in a telephone conversation, defendants GREY and LEYDEL talked about a gang injunction which had been served on defendant GREY and discussed whether to get Homeboy Industries involved, including getting them attorneys from "the ACLU."

182. On June 14, 2013, using coded language in a telephone conversation, defendant GREY informed defendant MENDOZA that he had "caught this fucker right here, right now," that the individual owed defendant GREY $500, and that he would give defendant MENDOZA $100 if defendant MENDOZA went over to help "get him."

183. On June 14, 2013, using coded language in a telephone conversation, defendant MENDOZA told defendant GREY that he could "roll up" to help assault the individual who owed money, to which defendant GREY told him that he had already "checked" the individual and that he did not want to cause a scene.

184. On June 14, 2013, using coded language in a telephone conversation, defendants GREY and LEYDEL discussed a future narcotics transaction.

185. On June 15, 2013, using coded language in a telephone conversation, defendant GREY told defendant S. ZEPEDA that he "got that mother fucker," referring to an individual who owed "taxes," and that he had extorted money from the individual.

186. On June 17, 2013, using coded language in a telephone conversation, defendant LEYDEL agreed to call defendant HAM at defendant GREY's request for enterprise-related business.

187. On June 22, 2013, using coded language in a telephone conversation, defendants GREY and LEYDEL discussed the death of Mexican Mafia member Lalo Martinez and joked that the Mexican Mafia

45

was looking for a "new CEO," with defendant GREY stating that he would update his resume.

188. On June 27, 2013, using coded language in a telephone conversation, defendants GREY and MENDOZA discussed that there was a .38 caliber firearm for sale for $250, and defendant GREY instructed defendant MENDOZA to purchase the firearm.

189. On June 27, 2013, using coded language in a telephone conversation, defendants GREY and JULIO BOSQUE agreed to use money generated from the enterprise's taxation scheme to purchase a .38 caliber firearm for sale for $250, with defendant GREY instructing defendant JULIO BOSQUE to deliver the money to purchase the firearm at Homeboy Industries.

190. On June 27, 2013, at Homeboy Industries, defendant JULIO BOSQUE gave defendant GREY money to purchase a .38 caliber firearm.

191. On June 27, 2013, at a location in Los Angeles, California, defendant GREY purchased a .38 caliber firearm from two males and drove to Homeboy Industries with the firearm.

192. On June 27, 2013, using coded language in a telephone conversation, defendant GREY instructed defendant LEYDEL to meet him at Homeboy Industries later that afternoon.

193. On June 27, 2013, at Homeboy Industries, defendant GREY gave defendant LEYDEL a .38 caliber firearm for transportation to an unknown location.

194. On June 27, 2013, defendant LEYDEL possessed a RG Industries Revolver, Model RG39 .38 caliber firearm, with serial number X018062 that was loaded with six rounds of .38 caliber ammunition and wrapped in a tan Homeboy Industries t-shirt.

195. On July 2, 2013, defendants S. ZEPEDA and VALENCIA

46

1   possessed letters written by EME Gonzales, including letters

2   addressed to S. ZEPEDA in his alias, "Selma Rodriguez," regarding

3   matters relating to Arnold Gonzales Organization business.

4        196. On July 2, 2013, defendant S. ZEPEDA and J. ZEPEDA

5   possessed a digital scale and photographs of Frogtown gang members.

6        197. On July 2, 2013, defendant JAVIER BOSQUE possessed a

7   stolen, loaded .45/410 caliber Taurus revolver, model El Juez, with

8   serial number CU874966; a digital scale; and almost 100 rounds of

9   ammunition of various calibers.

10        198. On July 2, 2013, using coded language in a telephone

11   conversation, defendants GREY and J. ZEPEDA talked about law

12   enforcement action conducted on defendants S. ZEPEDA and JULIO

13   BOSQUE, what was seized, the fact that defendant S. ZEPEDA had been

14   arrested, and how defendant GREY intended to deposit money on his

15   prison account, with defendant J. ZEPEDA noting that defendant GREY

16   should be careful because law enforcement was "hitting everyone," and

17   defendant GREY was taking "all the losses."

18        199. On July 3, 2013, using coded language in a telephone

19   conversation, defendant GREY asked defendant LEYDEL to text defendant

20   LAUBE's phone number ("Psycho's" number) because a "homie wanted

21   firearms ("fireworks"), which defendant LEYDEL agreed to do.

22        200. On July 6, 2013, using coded language in a telephone

23   conversation, defendants MENDOZA and GREY discussed taxes owed by

24   defendant HAM and another individual, with defendant MENDOZA agreeing

25   to follow up with defendant HAM regarding the outstanding "taxes."

26        201. On July 20, 2013, using coded language in an in-person

27   visit at Pelican Bay State Prison, defendant VALERIO and EME Gonzales

28   discussed defendant GREY dropping off "taxes" collected in enterprise

1  territory controlled by the Arnold Gonzales Organization.

2      202. On July 21, 2013, defendant T. GONZALES and EME Gonzales

3  talked about defendant GREY being "in charge," and how defendant S.

4  ZEPEDA worked with defendant GREY to benefit EME Gonzales.

5      203. On August 17, 2013, using coded language in an in-person

6  visit at Pelican Bay State Prison, defendant T. GONZALES confirmed to

7  EME Gonzales that defendant GREY regularly made his tax payments but

8  that defendant S. ZEPEDA did not pay as consistently.

9      204. On August 18, 2013, using coded language in an in-person

10 visit at Pelican Bay State Prison, defendant VALERIO told EME

11 Gonzales that a member of the Frogtown street gang falsely claimed to

12 have a letter from EME Gonzales, and defendant VALERIO and EME

13 Gonzales thereafter discussed who was "authorized" by EME Gonzales on

14 his behalf.

15     205. On August 20, 2013, using coded language in a recorded jail

16 conversation, defendants VALLEJO and LAUBE discussed the different

17 firearms in defendant LAUBE's possession, and defendant VALLEJO

18 instructed defendant LAUBE to relay his message of "welcome" to an

19 individual who had joined the Arnold Gonzales Enterprise.

20     206. On August 22, 2013, defendant LAUBE utilized security

21 cameras in his residence to detect law enforcement and inform other

22 individuals in the residence, including defendant VALLEJO, of the

23 presence of law enforcement.

24     207. On August 22, 2013, defendant LAUBE possessed

25 methamphetamine, as well as a .45 caliber Smith & Wesson handgun, a

26 .380 caliber Walther handgun loaded with seven .380 caliber rounds of

27 ammunition, a bolt action rifle, various rounds of ammunition, sheets

28 of counterfeit United States Currency along with counterfeiting

1   equipment, including a computer, various credit cards in the names of

2   five other individuals, various EBT cards in the names of four other

3   individuals, and various electronic purchase cards with no names.

4        208. On February 28, 2015, using coded language in a text

5   communication, defendant VALLEJO informed defendant S. ZEPEDA that he

6   was willing to die proving his worth for EME Gonzales.

7        209. On March 14, 2015, using coded language in a recorded jail

8   conversation, defendant VALLEJO stated to an associate that he saw

9   himself doing life in prison and that he was learning how to

10  manipulate people into doing what he wanted from inside prison,

11  noting that he was part of something that ended over fifty years of

12  fighting between Toonerville, Frogtown, and the Rascals, and referred

13  to the new organization as the "United Nations," explaining that

14  financial profit was the main objective in forming this enterprise.

15  D.   SPECIAL SENTENCING ALLEGATIONS

16       The Grand Jury further alleges that:

17       Beginning on a date unknown to the Grand Jury, and continuing to

18  on or about June 17, 2015, in Los Angeles County, within the Central

19  District of California, and elsewhere, defendants GREY, S. ZEPEDA, J.

20  ZEPEDA, VALLEJO, OLVERA, JULIO BOSQUE, JAVIER BOSQUE, HAM, VALENCIA,

21  LAUBE, ALDRETTE, AMADO, MURILLO, BARRETO, GOTHARD, and others known

22  and unknown to the Grand Jury, conspired and agreed with each other

23  to knowingly and intentionally commit the following offenses:

24       a.   To distribute at least 50 grams of methamphetamine, a

25  Schedule II controlled substance, in violation of Title 21, United

26  States Code, Sections 841(a)(1) and (b)(1)(A)(viii);

27       b.   To possess with intent to distribute at least 50 grams

28  of methamphetamine, a Schedule II controlled substance, in violation

1  of Title 21, United States Code, Sections 841(a)(1) and

2  (b)(1)(A)(viii);

3        c.   To distribute at least 280 grams of a mixture and

4  substance containing a detectable amount of cocaine in the form of

5  cocaine base, a Schedule II controlled substance, in violation of

6  Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(iii);

7        d.   To possess with intent to distribute at least 280

8  grams of a mixture and substance containing a detectable amount of

9  cocaine in the form of cocaine base, a Schedule II controlled

10 substance, in violation of Title 21, United States Code, Sections

11 841(a)(1) and (b)(1)(A)(iii);

12       e.   To distribute at least one kilogram of a mixture and

13 substance containing a detectable amount of heroin, a Schedule I

14 narcotic drug controlled substance, in violation of Title 21, United

15 States Code, Sections 841(a)(1) and (b)(1)(A)(i);

16       f.   To possess with intent to distribute at least one

17 kilogram of a mixture and substance containing a detectable amount of

18 heroin, a Schedule I narcotic drug controlled substance, in violation

19 of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(i).

20       g.   To distribute at least 5 kilograms of a mixture and

21 substance containing a detectable amount of cocaine, a Schedule II

22 controlled substance, in violation of Title 21, United States Code,

23 Sections 841(a)(1) and (b)(1)(A)(viii); and

24       h.   To possess with intent to distribute at least 5 kilograms

25 of a mixture and substance containing a detectable amount of cocaine,

26 a Schedule II controlled substance, in violation of Title 21, United

27 States Code, Sections 841(a)(1) and (b)(1)(A)(viii);

28

1        All in violation of Title 18, United States Code, Section

2    1962(d).

COUNT TWO

[18 U.S.C. § 1959(a)(3)]

1.    Paragraphs One through Nine of the Introductory Allegations of this Indictment are hereby re-alleged and incorporated by reference as though fully set forth herein.

2.    At all times relevant to this Indictment, the Arnold Gonzales Organization constituted an enterprise, as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.    At all times relevant to this Indictment, the Arnold Gonzales Organization, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is:

a.    acts involving the distribution of, possession with intent to distribute, and conspiracy to distribute and/or possess with intent to distribute, controlled substances, including heroin, methamphetamine, cocaine, and cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846;

b.    acts indictable under Title 18, United States Code, Section 1956 (money laundering);

c.    acts involving murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 189, 190, and 664; and

1         d.    acts involving extortion, in violation of California

2  Penal Code Sections 21(a), 31, 182, 518, 519, 520, and 664.

3       4.    On or about December 17, 2011, in Los Angeles County,

4  within the Central District of California, for the purpose of

5  maintaining and increasing his position in the Arnold Gonzales

6  Organization, an enterprise engaged in racketeering activity,

7  defendant MANUEL VALLEJO, also known as ("aka") "Boxer," assaulted

8  Ronal Garcia aka "Grinch" with a dangerous weapon, in violation of

9  California Penal Code Section 245(a)(2).

10      All in violation of Title 18, United States Code, Section

11  1959(a)(3).

53

COUNT THREE

[18 U.S.C. § 1959(a)(5)]

1.    Paragraphs One through Nine of the Introductory Allegations of this Indictment and Paragraphs Two and Three of Count Two are hereby re-alleged and incorporated by reference as though fully set forth herein.

2.    On or about May 26, 2012, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing his position in the Arnold Gonzales Organization, an enterprise engaged in racketeering activity, defendant JORGE GREY, also known as "Bouncer," and others known and unknown to the Grand Jury, conspired to assault "Victim One" with a dangerous weapon, in violation of California Penal Code Section 245(a)(2).

All in violation of Title 18, United States Code, Section 1959(a)(5).

COUNT FOUR

[18 U.S.C. § 1959(a)(3)]

1.    Paragraphs One through Nine of the Introductory Allegations of this Indictment and Paragraphs Two and Three of Count Two are hereby re-alleged and incorporated by reference as though fully set forth herein.

2.    On or about May 26, 2012, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing his position in the Arnold Gonzales Organization, an enterprise engaged in racketeering activity, defendant JORGE GREY, also known as "Bouncer," and others known and unknown to the Grand Jury, aiding and abetting one another, assaulted "Victim One" with a dangerous weapon, in violation of California Penal Code Section 245(a)(4) and Title 18, United States Code, Section 2.

All in violation of Title 18, United States Code, Sections 1959(a)(3) and 2.

COUNT FIVE

[21 U.S.C. § 846]

1.   Paragraphs One through Eight of the Introductory Allegations of this Indictment are hereby re-alleged and incorporated by reference as though fully set forth herein.

A.   THE CONSPIRACY

2.   Beginning on a date unknown to the Grand Jury, and continuing to on or about June 17, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants GREY, S. ZEPEDA, J. ZEPEDA, VALLEJO, OLVERA, JULIO BOSQUE, JAVIER BOSQUE, VALENCIA, HAM, LAUBE, ALDRETTE, AMADO, MURILLO, BARRETO, GOTHARD, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally distribute, and possess with intent to distribute, the following controlled substances:

     a.   at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii);

     b.   at least five grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii);

     c.   at least one kilogram of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(i);

     d.   at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance, in violation of Title 21, United States Code,

1  Sections 841(a)(1) and (b)(1)(B)(i);

2          e.   at least 280 grams of a mixture and substance

3  containing a detectable amount of cocaine in the form of cocaine

4  base, a Schedule II controlled substance, in violation of Title 21,

5  United States Code, Sections 841(a)(1) and (b)(1)(A)(iii); and

6          f.   at least 28 grams of a mixture and substance

7  containing a detectable amount of cocaine in the form of cocaine

8  base, a Schedule II controlled substance, in violation of Title 21,

9  United States Code, Sections 841(a)(1) and (b)(1)(B)(iii);

10          g.   at least five kilograms of a mixture and substance

11  containing a detectable amount of cocaine, a Schedule II controlled

12  substance, in violation of Title 21, United States Code, Sections

13  841(a)(1) and (b)(1)(A)(viii); and

14          h.   at least 500 grams of a mixture and substance

15  containing a detectable amount of cocaine, a Schedule II controlled

16  substance, in violation of Title 21, United States Code, Sections

17  841(a)(1) and (b)(1)(B)(viii).

18  B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
    ACCOMPLISHED

19

20      1-10. The Grand Jury re-alleges and incorporates by reference as

21  though fully set forth herein Paragraphs One through Ten of Section B

22  of Count One of this Indictment.

23  C.   OVERT ACTS

24      In furtherance of the conspiracy, and to accomplish the object

25  of the conspiracy, defendants GREY, S. ZEPEDA, J. ZEPEDA, VALLEJO,

26  OLVERA, JULIO BOSQUE, JAVIER BOSQUE, VALENCIA, HAM, LAUBE, ALDRETTE,

27  AMADO, MURILLO, BARRETO, GOTHARD, and others known and unknown to the

28  Grand Jury, committed and caused to be committed various overt acts,

on or about the following dates, within the Central District of California, and elsewhere, including, but not limited to, the following:

1-209.    The Grand Jury re-alleges and incorporates by reference as though fully set forth herein Paragraphs One through 209 of Section C of Count One of this Indictment.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about April 11, 2013, defendant GIOVANNI OLVERA, also known as ("aka") "Jiovanni Olvera," aka "Suspect," knowingly and intentionally distributed approximately 5.6 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about April 11, 2013, defendant JUAN MURILLO, also known as "Nacho," knowingly and intentionally possessed with intent to distribute approximately 5.6 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 12, 2013, defendants JONATHAN ZEPEDA, also known as ("aka"), aka "Japs," aka "Chino," and SANTOS ZEPEDA, aka "Slim," knowingly and intentionally distributed at least 50 grams, that is, approximately 107.5 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 13, 2013, defendant RYAN LAUBE, also known as "Psycho," knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 107.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 19, 2013, defendants JONATHAN ZEPEDA, also known as ("aka") "Japs," aka "Chino," JAVIER BOSQUE, aka "Big Cuba," aka "Cuba," and JULIO BOSQUE, aka "Lil' Cuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.4 grams, of methamphetamine, a Schedule II controlled substance.

1                                COUNT ELEVEN

2                  [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3        On or about April 25, 2013, defendant JULIO BOSQUE, also known

4 as ("aka") "Big Cuba," aka "Cuba," knowingly and intentionally

5 distributed at least 50 grams, that is, approximately 56.7 grams, of

6 methamphetamine, a Schedule II controlled substance.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWELVE

[21 U.S.C. § 860(a)]

On or about April 25, 2013, defendant JULIO BOSQUE, also known as ("aka") "Big Cuba," aka "Cuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 56.7 grams, of methamphetamine, a Schedule II controlled substance, within 1,000 feet of the real property comprising a public elementary school, that is, Aragon Avenue Elementary School.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about May 9, 2013, defendant GIOVANNI OLVERA, also known as ("aka") "Jiovanni Olvera," aka "Suspect," knowingly and intentionally possessed with intent to distribute 4.4 grams of methamphetamine, a Schedule II controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about May 9, 2013, defendant JOSE BARRETO, also known as "Joey," knowingly and intentionally possessed with intent to distribute approximately 3.2 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance.

## COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about May 16, 2013, defendant JULIO BOSQUE, also known as ("aka") "Big Cuba," aka "Cuba," knowingly and intentionally distributed at least five grams, that is, approximately 24.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about May 24, 2013, defendant JONATHAN ZEPEDA, also known as ("aka") "Japs," aka "Chino," knowingly and intentionally distributed at least 50 grams, that is, approximately 51.7 grams, of methamphetamine, a Schedule II controlled substance.

## COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about June 4, 2013, defendant JONATHAN ZEPEDA, also known as ("aka") "Japs," aka "Chino," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about June 5, 2013, defendant JONATHAN ZEPEDA, also known as ("aka") "Japs," aka "Chino," knowingly and intentionally possessed with intent to distribute at least five grams, that is, 5.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[18 U.S.C. § 924(c)(1)(A)(iii)]

On or about December 17, 2011, in Los Angeles County, within the Central District of California, defendant MANUEL VALLEJO, also known as "Boxer," knowingly brandished, discharged, carried, and used a firearm during and in relation to, and possessed a firearm in furtherance of, a crime of violence, namely, racketeering influenced corrupt organizations conspiracy, in violation of Title 18, United States Code, Section 1962(d), as charged in Count One of this Indictment, and violent crime in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(3), as charged in Count Two of this Indictment.

COUNT TWENTY

[21 U.S.C. § 924(c)(1)(A)(i)]

On or about June 4, 2013, in Los Angeles County, within the Central District of California, defendant JONATHAN ZEPEDA, also known as ("aka") "Japs," aka "Chino," knowingly brandished, carried, and used a firearm during and in relation to, and possessed a firearm in furtherance of, a crime of violence, namely, racketeering influenced corrupt organizations conspiracy, in violation of Title 18, United States Code, Section 1962(d), as charged in Count One of this Indictment, and drug trafficking crimes, namely, conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, as charged in Count Five of this Indictment, and the distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Seventeen of this Indictment.

COUNT TWENTY-ONE

[18 U.S.C. § 922(g)(9)]

On or about April 25, 2013, in Los Angeles County, within the Central District of California, defendant JAVIER BOSQUE, also known as "Lil Cuba" ("JAVIER BOSQUE"), knowingly possessed a firearm, namely, a Mossberg model 930, 12 gauge semiautomatic shotgun, bearing serial number AF086285, in and affecting interstate and foreign commerce.

Such possession occurred after defendant JAVIER BOSQUE had been convicted of a misdemeanor crime of domestic violence, namely, Infliction of Corporal Injury: Spouse/Cohabitant, in violation of California Penal Code Section 273.5(A), in the Superior Court of the State of California, County of Los Angeles, case number 9HY01197, on or about September 17, 2009.

COUNT TWENTY-TWO

[18 U.S.C. § 922(g)(1)]

On or about May 9, 2013, in Los Angeles County, within the Central District of California, defendant GIOVANNI OLVERA, also known as ("aka") "Jiovanni Olvera," aka "Suspect" ("OLVERA"), knowingly possessed the following firearms and ammunition, in and affecting interstate and foreign commerce:

1.    a Mossberg model 380, .22 caliber semiautomatic rifle, bearing serial number M57609;

2.    a Ruger model P89DC, 9mm Luger caliber semiautomatic pistol, bearing serial number 30327488;

3.    nine (9) rounds of CCI 9mm Luger caliber ammunition;

4.    twenty-nine (29) rounds of Winchester 9mm Luger caliber ammunition;

5.    four (4) rounds of Remington 7mm caliber ammunition;

6.    two (2) rounds of Federal .22 Long Rifle caliber ammunition; and

7.    one (1) round of Winchester 9mm Luger caliber ammunition.

Such possession occurred after defendant OLVERA had been convicted of at least one of the following felonies, each punishable by a term of imprisonment exceeding one year:

1.    Carrying a Loaded Firearm in Public, Special Circumstances, in violation of California Penal Code Section 12031(A)(1), in the Superior Court of the State of California, County of Los Angeles, case number BA318588, on or about April 20, 2007;

2.    Felon in Possession of a Firearm, in violation of California Penal Code Section 12021(A)(1), in the Superior Court of

1  the State of California, County of Los Angeles, case number BA329234,

2  on or about June 27, 2008.

COUNT TWENTY-THREE

[18 U.S.C. § 922(g)(9)]

On or about May 16, 2013, in Los Angeles County, within the Central District of California, defendant JAVIER BOSQUE, also known as "Lil Cuba" ("JAVIER BOSQUE"), knowingly possessed the following firearm and ammunition, in and affecting interstate and foreign commerce:

1.   A Ruger model Blackhawk .45 Colt caliber revolver, bearing serial number 47-55611;

2.   three (3) rounds of Federal .45 Colt caliber ammunition;

3.   two (2) rounds of Starline .45 Colt caliber ammunition; and

4.   one (1) round of Winchester .45 Colt caliber ammunition.

Such possession occurred after defendant JAVIER BOSQUE had been convicted of a misdemeanor crime of domestic violence, namely, Infliction of Corporal Injury: Spouse/Cohabitant, in violation of California Penal Code Section 273.5(A), in the Superior Court of the State of California, County of Los Angeles, case number 9HY01197, on or about September 17, 2009.

COUNT TWENTY-FOUR

[18 U.S.C. § 922(g)(1)]

On or about June 5, 2013, in Los Angeles County, within the Central District of California, defendant JONATHAN ZEPEDA, also known as ("aka") "Japs," aka "Chino" ("J. ZEPEDA"), knowingly possessed the following firearms and ammunition, in and affecting interstate and foreign commerce:

(1)   A Glock model 20, 10mm caliber semiautomatic pistol, bearing serial number BNR353;

(2)   a Norinco model 56S, 7.62x39mm caliber machinegun, bearing serial number 56S302183;

(3)   a Mossberg model 500, 12 gauge shotgun, bearing serial number K120050;

(4)   twenty-one (21) rounds of Smith & Wesson .38 Special caliber ammunition with single dots at both the 3 o'clock and 9 o'clock positions in the headstamps;

(5)   three (3) rounds of Smith & Wesson .38 Special caliber ammunition with double dots at both the 3 o'clock and 9 o'clock positions in the headstamps;

(6)   one (1) round of Smith & Wesson .38 Special caliber ammunition with no dots in the headstamps;

(7)   thirteen (13) rounds of Speer .38 Special caliber ammunition with single dots at the 9 o'clock position in the headstamps;

(8)   seven (7) rounds of Federal .40 Smith & Wesson caliber ammunition;

(9)   two (2) rounds of Remington .40 Smith & Wesson caliber ammunition;

78

1      (10) one hundred thirty-five (135) rounds of Winchester .45

2  Automatic caliber ammunition (headstamps "W-W" and "WCC");

3      (11) thirty (30) rounds of Remington .45 Automatic caliber

4  ammunition (headstamps "R-P," "RA," and "REM-UMC");

5      (12) sixteen (16) rounds of Federal .45 Automatic caliber

6  ammunition;

7      (13) four (4) rounds of Israel Military Industries .45 Automatic

8  caliber ammunition;

9      (14) four (4) rounds of PMC .45 Automatic caliber ammunition;

10     (15) two (2) rounds of Magtech Recreational Products .45

11  Automatic caliber ammunition;

12     (16) one (1) round of Aguila .45 Automatic caliber ammunition;

13     (17) one (1) round of Cascade Cartridge Company .45 Automatic

14  caliber ammunition;

15     (18) one (1) round of Fiocchi .45 Automatic caliber ammunition;

16     (19) one (1) round of Smith & Wesson .45 Automatic caliber

17  ammunition;

18     (20) three (3) rounds of Federal 12 gauge ammunition;

19     (21) two (2) rounds of Winchester 9mm Luger caliber ammunition;

20     (22) twenty-two (22) rounds of Wolf 7.62x39mm caliber

21  ammunition;

22     (23) eight (8) rounds of Barnaul 7.62x39mm caliber ammunition;

23     (24) four (4) rounds of Federal 12 gauge ammunition;

24     (25) two (2) rounds of Winchester .45 Automatic caliber

25  ammunition; and

26     (26) one (1) round of Federal .45 Automatic caliber ammunition.

27     Such possession occurred after defendant J. ZEPEDA had been

28  convicted of at least one of the following felonies, each punishable

by a term of imprisonment exceeding one year:

    1.    Possession, Any Assault Weapon, in violation of California Penal Code Section 12280(B), in the Superior Court of the State of California, County of Los Angeles, case number BA3755407, on or about September 29, 2010;

    2.    Possession of a controlled substance, in violation of California Health and Safety Code Section 11377(A), in the Superior Court of the State of California, County of Los Angeles, case number BA390969, on or about January 23, 2012.

COUNT TWENTY-FIVE

[18 U.S.C. § 922(g)(1)]

On or about June 27, 2013, in Los Angeles County, within the Central District of California, defendant KELLY LEYDEL, also known as "Giant" ("LEYDEL"), knowingly possessed the following firearm and ammunition, in and affecting interstate and foreign commerce:

(1)  a RG Industries Revolver, Model RG39 .38 caliber firearm, bearing serial number X018062;

(2)  three (3) rounds of Federal .38 Special caliber ammunition;

(3) two (2) rounds of Winchester .38 Special caliber ammunition; and

(4)  one (1) round of CCI .38 Special caliber ammunition.

Such possession occurred after defendant LEYDEL had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely, Force/Assault with a Deadly Weapon, Not Firearm: Great Bodily Injury Likely, in violation of California Penal Code Section 245(A)(1), in the Superior Court of the State of California, County of Los Angeles, case number BA2309001, on or about May 15, 2002.

COUNT TWENTY-SIX

[18 U.S.C. § 922(g)(9)]

On or about July 2, 2013, in Los Angeles County, within the Central District of California, defendant JAVIER BOSQUE, also known as "Lil Cuba" ("JAVIER BOSQUE"), knowingly possessed the following firearms and ammunition, in and affecting interstate and foreign commerce:

(1)   A Taurus model El Juez .45 Colt caliber revolver, bearing serial number CU874966;

(2)   twenty-three (23) rounds of Fiocchi .410 bore ammunition;

(3)   twenty-two (22) rounds of Winchester .45 Colt caliber ammunition;

(4)   thirty-five (35) rounds of Federal .45 Colt caliber ammunition;

(5)   twenty-four (24) rounds of Remington .410 bore ammunition;

(6)   four (4) rounds of Winchester .45 caliber ammunition; and

(7)   one (1) round of Fiocchi .410 bore ammunition.

Such possession occurred after defendant JAVIER BOSQUE had been convicted of a misdemeanor crime of domestic violence, namely, Infliction of Corporal Injury: Spouse/Cohabitant, in violation of California Penal Code Section 273.5(A), in the Superior Court of the State of California, County of Los Angeles, case number 9HY01197, on or about September 17, 2009.

COUNT TWENTY-SEVEN

[26 U.S.C. § 5861(d)]

On or about June 5, 2013, in Los Angeles County, within the Central District of California, defendant JONATHAN ZEPEDA, also known as ("aka") "Japs," aka "Chino" ("J. ZEPEDA"), knowingly possessed a firearm, namely, a Norinco model 56S, 7.62x39mm caliber machinegun bearing serial number 56S302183, which defendant J. ZEPEDA knew to be a machinegun, as defined in Title 26, United States Code, Section 5845(b), and which had not been registered to defendant J. ZEPEDA in the National Firearms Registration and Transfer Record as required by Chapter 53, Title 26, United States Code.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963, in the event of any defendant's conviction under Count One of this Indictment.

2.   Defendants shall forfeit to the United States the following property:

a.   All right, title, and interest in:

i.   any and all interest including, without limitation, any and all interest in any and all property (real, personal, tangible, intangible or otherwise) any person acquired or maintained in violation of Title 18, United States Code, Section 1962;

ii.   any and all interest in, security of, claims against, or property or contractual right of any kind affording a source of influence over, any enterprise which any person established, operated, controlled, conducted or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

iii. any and all property (real, personal, tangible, intangible or otherwise) constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Title 18, United States Code, Section 1962; and

b.   A sum of money equal to the total value of the property described in subsection a.  If more than one defendant is

84

found guilty under Count One, each such defendant shall be jointly and severally liable for the entire amount forfeitable pursuant to that Count.

3.    Pursuant to Title 18, United States Code, Section 1963(m), each defendant shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 853]

4.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Sections 853 and 881, and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under any of the Counts Five through Eighteen of this Indictment.

5.    Such defendants shall forfeit to the United States the following property:

a.    All right, title, and interest in any and all property, real or personal:

i.    constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense set forth in any of Counts Five through Eighteen of this Indictment; and

ii.    used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any offense set forth in any of Counts Five through Eighteen of this Indictment; and

b.    A sum of money equal to the total value of the property described in subsection a.  For each of Counts Five through Eighteen for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeitable pursuant to that Count.

6.    Pursuant to Title 21, United States Code, Section 853(p), each defendant shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of a defendant, the property

1   described in the preceding paragraph, or any portion thereof (a)
2   cannot be located upon the exercise of due diligence; (b) has been
3   transferred, sold to, or deposited with a third party; (c) has been
4   placed beyond the jurisdiction of the court; (d) has been
5   substantially diminished in value; or (e) has been commingled with
6   other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 924(d); 28 U.S.C. § 2461]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 924(d), of any defendant's conviction under any of the Counts Eighteen through Twenty-Six of this Indictment.

2.    Such defendants shall forfeit to the United States all firearms and ammunition involved in the commission of each such offense, including all firearms and ammunition identified in this Indictment.

A TRUE BILL

/S/

Foreperson

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

KEVIN M. LALLY
Assistant United States Attorney
Chief, Organized Crime Drug
  Enforcement Task Force Section

CAROL ALEXIS CHEN
Assistant United States Attorney
Organized Crime Drug Enforcement
  Task Force Section